IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE,<br><br>Plaintiff,<br><br>SABINA KAPLAN, SUPERINTENDENT OF BEDFORD HILLS CORRECTIONAL FACILITY; ROY SNYDER, DEPUTY SUPERINTENDENT FOR SECURITY; RUBEN GARCIA; CO MALDONADO; CARMEN PADILLA; JOHN/JANE DOES 1-10,<br><br>Defendants. | No.: 16-CV-____ (____)<br>(Jury Trial Demanded)<br>ECF Case<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Jane Doe, by and through her attorneys, alleges as follows:

## NATURE OF THE ACTION

1. Plaintiff is an inmate in the custody of the New York State Department of Corrections and Community Supervision (DOCCS). While incarcerated at Bedford Hills Correctional Facility (Bedford), a maximum-security prison, she was the victim of rape, sexual abuse, and other abusive and degrading acts for more than a year by Defendant corrections officer Ruben Garcia.

2. Garcia has already confessed to, and been convicted of, raping Plaintiff and upon information and belief, at least one other inmate under his supervision. He is just one in a list of corrections officers at Bedford and at other DOCCS' facilities who were disciplined, terminated

1

and/or prosecuted for rape and related misconduct against inmates immediately before, during and soon after the facts giving rise to this complaint.

3. Garcia's abuse of Plaintiff was perverse and pervasive, and included physical acts, and psychological and emotional manipulation. He transformed a model inmate who was getting her life together again by pursuing a college education and engaging in many positive activities in prison, into a person plagued by insecurities and fears, suffering from depression, extreme weight loss and no longer able to pursue her college programs.

4. Garcia's abuse of plaintiff, which included not only multiple sexual acts but also the production of pornographic videos made inside the prison, was only possible because of a correctional system so systemically negligent in its supervision of staff, and tolerant of illegal and improper conduct, as to have created a culture in which such behavior was allowed to flourish.

5. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 to redress violations of her rights by Garcia, who directly abused her, and the other Defendants, who were deliberately indifferent to her rights, safety, and dignity through their failures to follow policies and procedures established to prevent such abuses, their tolerance of such abuses, and their failures to remedy the culture and conditions in which such abuses were known to occur.

## JURISDICTION AND VENUE

6. This Court has jurisdiction under 28 U.S.C: §§ 1331 and 1343(a). Plaintiff's claims are authorized by 42 U.S.C. § 1997e(a) — (e), and 42 U.S.C. § 1983. This Court also has jurisdiction over the state law claims in this action pursuant to 28 U.S.C. §1367.

7.  Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the district.

## PARTIES

8.  At all times relevant herein, Plaintiff Jane Doe was an inmate in the custody of DOCCS at Bedford Hills and Taconic Correctional Facilities in Westchester County, New York.

9.  Ruben Garcia is sued in his individual capacity. At all relevant times, Garcia was a corrections officer at Bedford, and his duties included supervising, controlling and ensuring the safety of inmates at Bedford. Upon information and belief, Garcia resides in Westchester County, New York.

10. Maldonado is sued in his individual capacity. At all relevant times, Maldonado was a corrections officer at Bedford, and his duties included supervising, controlling and ensuring the safety of inmates at Bedford. Upon information and belief, Maldonado's principal place of business is the Bedford Hills Correctional Facility, 247 Harris Road, Bedford Hills, New York 10507.

11. Carmen Padilla is sued in her individual capacity. At all relevant times, Padilla was a corrections officer at Bedford in charge of the Office of Special Investigations, and her duties included supervising, controlling and ensuring the safety of inmates at Bedford as well as investigating, among other things, allegations of sexual misconduct within the facility. Upon information and belief, Padilla's principal place of business is the Bedford Hills Correctional Facility, 247 Harris Road, Bedford Hills, New York 10507.

12. Sabina Kaplan is sued in her individual capacity. At all relevant times, Kaplan was the Superintendent of Bedford. Upon information and belief, Kaplan was responsible for the

assignment and removal of staff; the training of staff; the supervision of staff and inmates to ensure a safe environment, including the enforcement of DOCCS' rules and regulations; the housing assignment of inmates within the facility; the review of decisions to place prisoners in punitive or administrative segregation; the investigation of and response to complaints of misconduct against staff, in conjunction with the Inspector General's Office; and establishing and/or enforcing the customs and practices with regard to sexual contact and conduct between employees and inmates at Bedford. Kaplan was also the supervisor of Defendants Snyder, Garcia, Maldonado, Padilla, and John/Jane Does at all relevant times. Upon information and belief, Kaplan's principal place of business is the Bedford Hills Correctional Facility, 247 Harris Road, Bedford Hills, New York 10507.

13. Roy Snyder is sued in his individual capacity. At all relevant times, Snyder was the Deputy Superintendent for Security at Bedford, and was responsible for the training and supervision of staff and inmates to ensure a safe environment, including the enforcement of DOCCS' rules and regulations; the investigation of and response to complaints of misconduct against staff, in conjunction with the Inspector General's Office; decisions concerning the assignment of staff, including whether to remove staff from contact with prisoners; decisions concerning the assignment of inmates, including whether to remove inmates from contact with certain staff; and for establishing and/or enforcing the customs and practices with regard to sexual contact and conduct between employees and inmates at Bedford. Upon information and belief, Snyder's principal place of business is the Bedford Hills Correctional Facility, 247 Harris Road, Bedford Hills, New York 10507.

14. The true names of Defendants JOHN/JANE DOES 1-10 are presently unknown. Plaintiff will amend this complaint with Defendants' true names and capacities when known. Plaintiff is

informed and believes, and based thereon alleges, that Defendants JOHN/JANE DOES 1-10 were corrections officers or supervisors who were aware of Garcia's abuse and failed to take steps to prevent or stop it, or to protect Plaintiff.

15. At all relevant times, Defendants were acting under color of New York state law. Each Defendant is responsible for the occurrences hereinafter alleged, which proximately caused Plaintiff's injuries.

## STATEMENT OF FACTS

16. Defendant Garcia pursued, seduced, and sexually assaulted and abused Plaintiff repeatedly from December 2013 to January 2015.

17. When the abuse began, Plaintiff was housed in a dorm-style unit of Bedford Hills Correctional Facility, a maximum-security women's prison; inmates' bunks were separated by dividers into units called "cubes."

18. In about mid-December 2013, Garcia came by Plaintiff's cube, apologized for missing her birthday, and threw a pack of cigarettes onto her bunk. He returned to her unit again that night and gave her a letter describing how he wanted to kiss, hold, and "fuck" her, and that every time he saw her sleeping he wanted to crawl into bed with her.

19. Over the next few months, Garcia escalated his efforts to groom Plaintiff. He undoubtedly had time to observe Plaintiff and look into her personnel records, and he began spending a lot of time talking to her, and shared personal details about himself. He brought Plaintiff's favorite coffee into the facility for her, cooked with her on her unit, courted her with gifts, praise, and flattery, made her feel special, and otherwise emotionally exploited her.

20. He pursued a course that combined false affection and reminders of his position of power over her. He would show his interest in her and ask for sexual favors from her but if she showed a lack of interest or fear at the brazenness of his request, he would insist until he got his way.

21. He began writing sexually charged love letters to her and demanding that she write letters to him in return on a near daily basis, often letting her know what he expected the letters to say.

22. Garcia also began working more and more overtime to be near Plaintiff. When he was not assigned to work Plaintiff's area, he would get clearance from the sergeant supervisor to swap assignments into Plaintiff's area.

23. In or about early February 2014, Garcia came into Plaintiff's cube, woke her up, performed oral sex on her, and penetrated her with his fingers. Plaintiff felt nervous and asked him to leave. But, with the direct and indirect support of fellow officers and supervisors, his abuse escalated.

24. He started bringing in intimate apparel for Plaintiff to wear then return to him. He also brought in his i-pod with playlists and recordings he made for Plaintiff, and video recordings he had his young son make for her.

25. On one occasion, Garcia and Defendant Maldonado brought Plaintiff and another inmate, who Maldonado was having sexual relations with, to the officer's station on the unit and gave them liquor.

26. The officer's station was in an area adjacent to and in view of where other inmates slept and officers did rounds. However, Garcia and Maldonado were the only two guards on Plaintiff's unit that night and, upon information and belief, other officers backed them up by making warning phone calls if a supervising officer was making rounds to the unit.

27.     Garcia had Plaintiff go under the officer's desk. When she did, Garcia unzipped his pants, exposed his penis, and moved Plaintiff's head towards his penis, directing her to perform oral sex on him under the desk while he pulled aggressively on her hair until he ejaculated. At about the same time, Defendant Maldonado and the other inmate were engaged in sexual acts nearby.

28.     Garcia then took Plaintiff to her cube, undressed her, spanked her, then performed oral sex on her and continued to pull her hair. Plaintiff became nervous and told him to stop, but he laid her on her bunk and had sexual intercourse with her. Unbeknownst to Plaintiff, Defendant Maldonado was nearby watching.

29.     Garcia's brazenness continued to escalate. On another occasion, he brought alcohol into the facility, gave it to Plaintiff and several other inmates, and then told them to use his I-pod to videotape themselves in sexual situations in the shower for his pleasure.

30.     Garcia also became increasingly possessive of Plaintiff and paranoid that other officers were trying to take her from him. His possessiveness however was not so much of mistrust of Plaintiff as it was of other officers. It was common at Bedford for inmates to be sexually harassed and/or exploited by multiple officers, who "pursued" them.

31.     Maldonado groped Plaintiff on several occasions while she was being sexually abused by Garcia, and the day after the fellatio incident under the officer's desk, another officer wondered aloud to Plaintiff how small a person had to be to fit under that desk, in direct reference to that incident, which served as a reminder to Plaintiff that officers were in on the sexual activities of their colleagues and protected each other.

32.     Upon information and belief, the sexual predation climate at Bedford followed a "law of the jungle" where numerous officers collaborated and competed with one other in their sexual

abuse of inmate's as they saw fit. The institutional negligence allowed an inordinate number of officers to act like pimps and treat this maximum security prison as their personal brothel where they could use, abuse, share and discard inmates at their pleasure.

33. Garcia tried to isolate and control Plaintiff, questioning her whereabouts and demanding that she miss more and more work to be with him. No staff questioned Plaintiff as to why she was missing so much work, or why Garcia always kept her back from her work detail to do "special projects," Garcia also established patterns she had to follow, and he even stalked her from outside, throwing things at her window if he saw someone in her cube.

34. One day, as Plaintiff was about to take a shower, Garcia did an unauthorized search of her cell and instructed her to open her robe for him under the threat that if she did not, he would not leave her cube and he might find contraband.

35. Garcia's sexual demands also became more and more sadistic. He would pull Plaintiff's hair with such force that it left her with a headache for hours after, and he slapped her buttocks with such force that it left her bruised. He also brought Plaintiff a dildo and a vibrator and demanded that she use them when videotaping herself.

36. He demanded that she use the dildo to sodomize herself on video, which was a sexual act she had never practiced nor liked and left her bleeding and in pain for long periods of time. Thus turning a pleasure object into an instrument of torture.

37. Plaintiff does not know the whereabouts of these videos, and she lives with the constant fear that they are or will be put online where her family, children, or the public might discover them. To this day this creates unending anxiety for her.

38. Several times after having sex, fearing she would get pregnant, Garcia brought her a "morning after" pill, which made her sick for several days with nausea and excessive bleeding.

39. Garcia continued to come into Plaintiff's cube to have sexual encounters, including oral and vaginal sexual intercourse, he continued to have Plaintiff make sexual recordings of herself on his I-pod, and he continued to bring in to the facility all manner of contraband, including liquor, sex toys, video recording devices, food, cigarettes, audio and video disks/cassettes, an inscribed ring, lingerie, love letters, nail polish, nail polish remover, make-up, and other items. In April 2014, Plaintiff returned from a Family Reunion Program visit to find that OSI investigators Padilla and Russo had raided her cube. They questioned her about sexual contact between her and Garcia, but other inmates and officers were nearby, and Plaintiff feared the consequences she would face for speaking.

40. Plaintiff told the investigators that she was afraid to speak with them, that CO Maldonado had intimidated her, and that she feared punishment or retaliation if she spoke. She also feared being transferred to an upstate facility where she would no longer have family visit privileges, and would lose her college program and the various jobs she had worked so hard to earn in Bedford.

41. Plaintiff's fears were well founded. She saw other inmates who reported abuse get transferred while the officers who abused them were allowed to stay and instill fear in other inmates. In fact, Plaintiff's former bunkmate was transferred to an Upstate prison after she reported abuse by a corrections officer, while that officer was allowed to continue to work at Bedford.

42. Garcia had also threatened Plaintiff that he knew exactly what was being said when she met with OSI because Maldonado knew someone who worked in that unit and informed him of those facts. And in fact, Garcia did know when Plaintiff was interviewed, which further increased her fear that she would be punished if she disclosed anything to OSI.

43. Nevertheless, upon information and belief, at this time OSI already had substantial information of Garcia's sexual misconduct with Plaintiff and at least two other inmates. Despite this, little was done to protect Plaintiff or to monitor Garcia, who remained free at the facility to continue his abuse.

44. In April 2014, Garcia had a car accident and went on leave for a few months. About a month after his return, Plaintiff began to reach her breaking point and told Garcia that she wanted him to leave her cube and to leave her alone. Garcia laughed at her and left, but he returned a few minutes later with a note for her, told her that he loved her and that if she did not believe him she could give the note to the officer-in-charge right then and there, but that he was not leaving her cube. He threatened to kill himself if she left him. Garcia returned to Plaintiff's cube later that night and performed oral sex on her.

45. Upon information and belief, a Jane Doe corrections officer on duty the night Garcia threatened to kill himself and then had sex with Plaintiff, who apparently knew that something inappropriate happened, told a John Doe officer her concerns. But that officer simply told another officer who, instead of taking any steps to protect Plaintiff, protected Garcia instead and told him about the suspicion. Upon information and belief, none of these three officers took any steps to stop Garcia or to protect Plaintiff.

46. There were other times when John/Jane Doe officers shined their flashlights on Garcia when he was in Plaintiff's cube to warn him or chase him away because he was being so brazen. But, upon information and belief, aside from this, these officers took no meaningful steps to try to protect Plaintiff.

47. In October 2014, Defendant Padilla came to Plaintiff's unit again. Garcia, who was working on the unit, had kept Plaintiff back from her program. When Padilla asked Plaintiff why

10

she was not at program, Plaintiff told her she did not feel well. Plaintiff had Garcia's I-pod in her cubby and liquor and various letters he gave her were in her cell, but neither Plaintiff nor her cell were searched.

48. Plaintiff was told to pack her belongings and moved to another unit. But Garcia, who was apparently not under any additional supervision or monitoring by supervisors or OSI, was able to continue his abuse of Plaintiff.

49. One day in December 2014, he kissed and touched Plaintiff in the school building basement, had her put a vibrator in her vagina, which he then put into his mouth. When Plaintiff and Garcia walked out of the basement, another officer, who upon information and belief was a sergeant, reminded Garcia about the importance of "appearances." However, upon information and belief, this officer was only concerned with protecting Garcia, and he failed to take any step to protect Plaintiff. On another morning that month, Garcia brought Plaintiff back to the lobby of her unit and touched and kissed her right outside the lobby door. On December 23, 2014 Plaintiff was told to pack her belongings for the draft to Taconic Correctional Facility. She was locked in her cell and unable to call her family on Christmas, or to otherwise leave her cell or her unit until her transfer to Taconic on December 26.

50. Despite her transfer, and even though Garcia should have at the very least been under heightened supervision, he continued to send Plaintiff letters, messages, money orders, and packages.

51. In February 2015, Defendant Padilla told Plaintiff that Garcia was arrested, that OSI found the I-pod with the video recordings, and that Plaintiff could talk to them now because she would be safe. This was partially a lie, since Garcia had not actually been arrested, but Plaintiff believed it and finally felt safe and wrote a statement about the abuse. She also gave OSI various

letters, money order receipts, clothing, an engraved lighter, pictures, a card, and a book with Garcia's home phone number written inside, and she directed them to where they could retrieve the dildo and vibrator.

52. In August 2015, Garcia was actually arrested, and he later pled guilty to raping Plaintiff and another inmate. He was sentenced to ten years of probation.

53. Garcia's abuse of Plaintiff was an abuse of power bordering on sadism. For over a year, he manipulated and had his way with Plaintiff with complete impunity, transforming her in the process from a model inmate into his personal "plaything." He manipulated her into providing him sexual favors through a combination of depraved seduction and intimidation. He brought all manner of contraband into the facility, which he used to manipulate and control Plaintiff, and to create pornographic videos for himself.

54. That Garcia was comfortable enough to do all of this, and confident enough that his actions would not be discovered or would go unpunished, is evidence of the complete lack of supervision at Bedford. That he was able to do all of this so brazenly, in such varied ways and over such a long period of time is telling of a recklessly negligent institutional environment at Bedford.

55. In fact, upon information and belief, before and during the time Garcia was abusing Plaintiff, a slew of other corrections officers were also engaged in sexual abuse of inmates at Bedford. These include Sergeant David Sawyer who pleaded guilty in 2009 to 3rd degree rape of an inmate at Bedford; Frederick Brenyah, convicted in 2010 of attempted rape of an inmate at Bedford; Richard Rodriguez, charged with 3rd degree rape of an inmate in 2014; Kevin R. Fields, charged with 3rd degree rape of an inmate in 2014; and Rasheen Smalls, charged with raping an inmate in 2015. In addition, several prior lawsuits have been filed about the sexual abuse of

inmates at Bedford. As a result of the abuse she suffered at Bedford, Plaintiff has experienced serious physical, mental, and emotional injury including insomnia, depression, anxiety, emotional distress, weight loss and heightened vigilance and fear.

56. Upon information and belief, Garcia also transmitted genital herpes to Plaintiff. Genital herpes is a sexually transmitted disease that is incurable, contagious, chronic and lifelong, can cause pain and discomfort, has potentially serious complications, causes heightened vulnerability to other diseases such as AIDS and viral meningitis, and can be transmitted to a baby during childbirth. Treatment to control outbreaks can be costly.

57. To make matters worse, the Department of Corrections also failed to ensure that Plaintiff received adequate mental health counseling and support to recover. Plaintiff began requesting to see mental health starting in or about October 2014. But despite her numerous requests to various people, including unit officers, her work supervisor, the deputy superintendent of security, and others, she was not seen until March 2015. And even then, she has been denied all but bare minimum mental health assistance and a handful of counseling sessions, even though she needs and wants regular counseling to help her to recover and to deal with what happened to her.

58. And although Plaintiff's transfer to Taconic in December 2015 provided some relief because she was physically away from Garcia, it also punished her and caused setbacks because the Department of Corrections failed to make provisions to ensure that in the new facility she could continue with her college studies and with her other work and programming, or to ensure that she would not have to re-qualify for Family Reunion Program visits and other privileges that she had already earned and lost through no fault of her own.

59.     Plaintiff was one semester away from earning her Bachelor's Degree, but since the college program is not available at her current facility, she has been unable to complete it. Plaintiff also lost her program working for the Department of Motor Vehicles, which was only available at Bedford.

### FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS GARCIA AND MALDONADO

**EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**
**-Cruel and Unusual Punishment-**

60.     Plaintiff repeats and realleges all preceding paragraphs as though set forth in full.

61.     The aforementioned abuse of Plaintiff by the above-named Defendants was undertaken intentionally, maliciously, and sadistically as rape and sexual abuse are inherently cruel and unusual.

62.     These actions, taken under color of state law, inflicted substantial pain and emotional and physical injuries on Plaintiff, and violated her right to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution.

63.     As a direct and proximate result of these unconstitutional acts, Plaintiff has been seriously injured.

### SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS MALDONADO, PADILLA, AND JOHN/JANE DOES 1-10

**EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**
**-Failure to Protect-**

64. Plaintiff repeats and realleges all preceding paragraphs as though set forth in full.

65. Corrections officers and staff have a duty to take reasonable steps to protect inmates in their care and custody and to intervene when the Constitutional rights of such inmates are violated.

66. The above-named Defendants violated this duty when, as heretofore described, they intentionally ignored evidence that Garcia was sexually inappropriate with inmates prior to his abuse of Plaintiff, and/or ignored the evidence that he was abusing Plaintiff and failed to take any meaningful steps to protect Plaintiff from his abuse, thereby allowing it to occur and to continue for more than a year.

67. The deliberate failures of these Defendants, taken under color of state law, to protect the Plaintiff from abuse violated her right to be free from cruel and unusual punishment, as guaranteed by the Eighth and Fourteenth Amendments of the Constitution of the United States.

68. As a direct and proximate cause of these unconstitutional acts and omissions, Plaintiff has been seriously injured.

### THIRD CLAIM FOR RELIEF AGAINST SUPERVISORY DEFENDANTS KAPLAN, SNYDER, AND PADILLA

**EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**
-Failure to Implement Policies and Practices to Avoid Violations of Constitutional Rights, and Failure to Train/Supervise Employees-

69. Plaintiff repeats and realleges all preceding paragraphs as though set forth in full.

70. Upon information and belief, DOCCS has instituted policies and procedures to protect inmates from sexual abuse but as heretofore described, Defendants Kaplan, Snyder, and Padilla

15

have, through gross negligence, demonstrated deliberate indifference to inmates at Bedford, including Plaintiff, by failing or refusing to enforce these policies.

71. These Defendants have also allowed a culture to flourish at Bedford where the sexual abuse of inmates is tolerated, they have failed to adequately supervise officers, including Garcia, and they failed to adequately train and/or supervise other subordinate officers to ensure that the Constitutional rights of inmates in their care are protected.

72. As heretofore described, Garcia was able to abuse Plaintiff for more than a year under the very noses of other officers, supervisors, and OSI. Despite the evidence and outright knowledge that Garcia was abusing Plaintiff, and upon information and belief, other inmates prior to Plaintiff, these Defendants failed to subject him to any additional or meaningful supervision or monitoring, and in fact allowed him to work additional shifts and change assignments to spend even more time with Plaintiff, allowed him to bring an unbelievable amount of contraband into the facility, which he used to facilitate his abuse, and failed to take any meaningful actions to protect Plaintiff. As a direct and proximate result of these Defendants acts and omissions, the Plaintiff has been seriously injured

## FOURTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### STATE LAW CLAIM
### -Negligence-

73. Plaintiff repeats and realleges all preceding paragraphs as though set forth in full.

74. Defendants are liable for negligence because, as heretofore described, they failed to discharge their duties to provide for Plaintiff's safety and physical and mental well-being while she was in their care by failing to take adequate or meaningful action to prevent or to stop Garcia's abuse.

75. Supervisory Defendants are vicariously liable for the actions and inactions of their subordinates as described above because they employed or directly supervised these subordinates at the time they committed these acts.

76. As a direct result of the unlawful acts of these Defendants, Plaintiff has been seriously injured.

## FIFTH CLAIM FOR RELIEF AGAINST DEFENDANTS KAPLAN, SNYDER, AND PADILLA

### STATE LAW CLAIM
### -Negligent Supervision-

77. Plaintiff repeats and realleges all preceding paragraphs as though set forth in full.

78. Supervisory Defendants are liable for negligent supervision and training of its employees and subordinates because in failing to properly supervise and train these employees and subordinates Defendants committed the acts described above, causing injury to Plaintiff.

79. As a direct result of the unlawful acts of these Defendants, Plaintiff has been seriously injured.

## SIXTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### STATE LAW CLAIM
### -Negligent Infliction of Emotional Distress-

80. Plaintiff repeats and realleges all preceding paragraphs as though set forth in full.

81. Defendants are liable for negligent infliction of emotional distress because their heretofore described failures to discharge their duties to provide for Plaintiff's safety and physical and mental well-being while she was in their care allowed her to be abused.

82. As a direct and proximate result of Defendants' acts, Plaintiff has been seriously injured.

## PUNITIVE DAMAGES

83. The actions and inactions of the Defendants as described above were extreme, outrageous, and shock the conscience of a reasonable person. As such, an award of punitive damages is appropriate.

## JURY DEMAND

84. Plaintiff hereby requests and demands a trial by jury.

## PRAYER FOR RELIEF

For this Complaint, based on all the above causes of action, Plaintiff prays for the following:

(a) Compensatory damages jointly and severally from each defendant, in an amount to be proved at trial;

(b) Punitive damages from each individual defendant;

(c) Attorneys' fees, costs, and disbursements incurred in this action pursuant to 42 U.S.C. §1988;

(d) Such further and other relief as the Court deems proper.

Dated: December 15, 2016

Respectfully submitted by:

Jessica M. Gorman
SDNY Bar Roll No.: JG8442
Law Office of Jessica M. Gorman
74 Chapel Street, 2nd floor
Albany, New York 12207
T: 518-795-5022
F: 518-514-1180
jmgorman@jmgormanlaw.com

Mario A. Vasquez
498 Main Street, Suite 1
New Rochelle, New York 10801
T: 646-220-2426
mario@mariolaw.com
*Of Counsel*

**Attorneys for the Plaintiff**