UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/22/18

JANE DOE,

Plaintiff,

-against-

SABINA KAPLAN, SUPERINTENDENT OF BEDFORD HILLS CORRECTIONAL FACILITY; ROY SNYDER; DEPUTY SUPERINTENDENT FOR SECURITY; RUBEN GARCIA; C.O. MALDONADO; CARMEN PADILLA; JOHN/JANE DOES 1-10,

Defendants.

16-cv-9870

OPINION AND ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Jane Doe, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action on or about December 22, 2016 against Sabina Kaplan, Superintendent of Bedford Hills Correctional Facility ("Bedford"), Roy Snyder, Deputy Superintendent of Bedford, Ruben Garcia, Corrections Officer Maldonado,[1] and Carmen Padilla (collectively "Defendants") for alleged violations of her constitutional rights, pursuant to 40 U.S.C. § 1983, and for state law violations that occurred while she was an inmate at Bedford.[2] (*See* Complaint ("Compl."), ECF No. 1.) Presently before the Court is Defendants Kaplan, Snyder, and Padilla's (the "Supervisory Defendants") motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1) for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction. (*See* Supervisory Defendants' Brief in Support of the Motion to Dismiss ("Defs. Br."), ECF No. 29). For the following reasons, the Supervisory Defendants' motion is DENIED in part and GRANTED in part.

[1] Plaintiff has not identified CO Maldonado's first name.
[2] Plaintiff also asserts claims against several John and Jane Does.

# FACTUAL BACKGROUND

The following facts are taken from Plaintiff's Complaint filed on December 22, 2016 and are accepted as true for purposes of this motion.[3]

While Plaintiff was an inmate at Bedford, she was housed in a "dorm-style unit" where the inmates resided in divided units called "cubes." (*See* Compl. ¶¶17, 49.) Plaintiff alleges that between December 2013 and January 2015, she was repeatedly sexually harassed, assaulted, abused, and raped by Defendant Garcia, a corrections officer at Bedford at the time. (*Id.* ¶¶1, 16.) She further alleges that Garcia's conduct was enabled by "the direct and indirect support of fellow officers and supervisors." (*Id.* ¶23.)[4]

Garcia's conduct began around December 2013 when he "apologized for missing [Plaintiff's] birthday, and threw a pack of cigarettes onto her bunk." (*Id.* ¶18.) Thereafter, he started to spend time with her and share personal details about himself, write explicit letters to her detailing his sexual interests, and bring her gifts. (*Id.* ¶¶18-19.) As his interest grew, Garcia began working more overtime, obtained clearance from a supervisor to "swap assignments into Plaintiff's area", and wrote more sexually explicit "love letters" to Plaintiff, insisting she reciprocate on a "near daily basis." (*Id.* ¶¶20-22.)

At some point, in February of 2014, the physical contact began when Garcia entered Plaintiff's cube while she was sleeping, woke her up, and performed various sexual acts on her, but Plaintiff felt nervous and asked him to leave. (*Id.* ¶23.) Thereafter, Garcia provided Plaintiff with "intimate apparel . . . to wear[,] then return to him" and an I-pod containing playlists, recordings, and videos he prepared for her. (*Id.* ¶24.)

---

[3] The Court assumes the truth of the facts alleged in Plaintiff's Complaint for purposes of this motion only. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[4] While the Supervisory Defendants did not directly participate in the alleged sexual abuse, a full accounting of the abuse is nonetheless necessary to understand the Supervisory Defendants' role in this lawsuit.

On a later, unspecified date, Garcia and Defendant Maldonado brought Plaintiff and another inmate to the officer's station and provided them with liquor. (*Id.* ¶25.) Garcia then forced Plaintiff "under the officer's desk", exposed himself, "moved Plaintiff's head towards his penis", and made her perform oral sex on him, all while aggressively pulling on her hair.[5] (*Id.* ¶¶25, 27.) This officer's station was "in view of where other inmates slept and officers did rounds", and "other officers backed [Garcia and Maldonado] up by making warning phone calls if a supervising officer was making rounds to the unit." (*Id.* ¶26.)

Immediately following this incident, Garcia led Plaintiff to "her cube, undressed her, spanked her, and then performed oral sex on her and continued to pull her hair." (*Id.* ¶28.) When Plaintiff asked Garcia to stop, he climbed onto her bunk and had sexual intercourse with her, while Defendant Maldonado was allegedly watching nearby.[6] (*Id.*) Shortly after the incident at the officer's desk, another officer "wondered aloud to Plaintiff how small a person had to be to fit under that desk", a comment Plaintiff perceived as "a reminder . . . that officers were in on the sexual activities of their colleagues and protected each other."[7] (*Id.*)

On a subsequent occasion, Garcia brought alcohol to the facility, "gave it to Plaintiff and several other inmates, and then told them to use his I-pod to videotape themselves in sexual situations in the shower for his pleasure." (*Id.* ¶29.) Further, one day as Plaintiff was preparing to shower, Garcia searched her cell, "instructed her to open her robe for him", and threatened to remain in her cell and "find contraband" if she refused. (*Id.* ¶34.)

Garcia's conduct continued to escalate, and he began isolating Plaintiff, "questioning her whereabouts[,] and demanding that she miss more and more work to be with him." (*Id.* ¶33.) He

---

[5] During this time, Maldonado was allegedly engaged in sexual conduct with the other inmate. (*See* Compl. ¶25.)
[6] On a number of occasions "while [Plaintiff] was being sexually abused by Garcia", Defendant Maldonado would grope her. (*Id.* ¶31.)
[7] Though not explicitly asserted, reading the allegations in context, this comment likely happened within a few days of the incident at the officer's station.

3

also began establishing patterns "she had to follow" and "throwing things at her window if he saw someone in her cube." (*Id.* ¶34.) Garcia also provided Plaintiff with various sex toys and "demanded that she use them when videotaping herself." (*Id.*) On one occasion he demanded that Plaintiff sodomize herself with a sex toy, which left her "bleeding and in pain for long periods of time." (*Id.* ¶36.) Plaintiff does not have access to the videos Garcia required her to make and "lives with the constant fear that they are or will be put online where her family, children, or the public might discover them." (*Id.* ¶37.)

After many of these encounters, Plaintiff was left with prolonged headaches and bruising on her behind from the force with which Garcia pulled her hair and slapped her. (*Id.* ¶35.) Additionally, at numerous times Garcia gave Plaintiff an emergency contraceptive, the so-called "morning after pill", which allegedly caused her to be "sick for several days with nausea and excessive bleeding." (*Id.* ¶38.)

In April of 2014, Plaintiff found Defendant Padilla and another investigator from the Office of Special Investigations ("OSI"), Russo,[8] in her cube. (*Id.* ¶39.) The investigators inquired into sexual contact between Plaintiff and Garcia, but Plaintiff informed the investigators "that she was afraid to speak with them, that CO Maldonado had intimidated her, and that she feared punishment or retaliation if she spoke." (*Id.* ¶39-40.) Plaintiff also feared that if she spoke, she would be transferred to an upstate facility where she would lose several privileges, (*id.* ¶40); such fear was based on her knowledge of other inmates that were transferred after reporting officer abuse while the officers who they reported were permitted to remain at Bedford. (*Id.* ¶41.) Moreover, Garcia threatened Plaintiff not to report the abuse: in fact, he told her that "he knew exactly what was being said when she met with OSI." (*Id.* ¶42.) After the April 2014 discussion with OSI, Plaintiff claims no steps were taken to "protect [her] or to monitor Garcia." (*Id.* ¶43.)

---

[8] Russo is not a party to this action and was only identified by last name in Plaintiff's Complaint.

That same month, Garcia was in a car accident and was out on leave for a few months. (*Id.* ¶44.) When he returned, he continued his abuse of Plaintiff, so she told him to leave her alone. (*Id.* ¶44.) In response, Garcia laughed, left her cube, and returned shortly thereafter with a note. (*Id.*) He then "told her [] he loved her[,] and that if she did not believe him she could give the note to the officer-in-charge right then and there, but that he was not leaving her cube." (*Id.*) Garcia also threatened to kill himself "if she left him," and returned to Plaintiff's cube later that evening and "performed oral sex on her." (*Id.*)

Plaintiff alleges that a Jane Doe corrections officer on duty that night knew about Garcia's conduct and informed a fellow officer about her concerns, who merely related it to another officer. (*Id.* ¶45.) At various other times, "officers [would] shine[] their flashlights on Garcia when he was in Plaintiff's cube to warn him or chase him away because he was being so brazen." (*Id.* ¶46.)

In October of 2014, Defendant Padilla again went to Plaintiff's cube to speak with her. (*Id.* ¶47.)[9] Plaintiff was supposed to be "at program" at the time, and when Padilla inquired into her absence, Plaintiff said "she did not feel well."[10] (*Id.* ¶47.) Plaintiff was then relocated to another unit, but Garcia "was able to continue his abuse." (*Id.* ¶48.) On one occasion in December of that year, Garcia "kissed and touched Plaintiff in the school building basement, [and] had her put a vibrator in her vagina, which he then put into his mouth." (*Id.* ¶49.) As they were leaving that location, a sergeant "reminded Garcia about the importance of 'appearances.'" (*Id.*) On another occasion that month, Garcia escorted Plaintiff to her unit and "touched and kissed her right outside the lobby door." (*Id.*)

On December 23, 2014, Plaintiff was informed that she would be transferred to Taconic Correctional Facility, "was locked in her cell and unable to call her family on Christmas, or

---

[9] The Complaint does not indicate whether Padilla questioned Plaintiff about Garcia during this meeting.
[10] Plaintiff alleges that the real reason she was not at program was that Garcia had kept her back, (*see* Compl. ¶47), as he had done on prior occasions, (*id.* ¶33.)

5

otherwise leave her cell", and was relocated on December 26, 2014. (*Id.*) Even after her transfer to a completely different facility, Garcia continued to contact Plaintiff by "send[ing her] letters, messages, money orders, and packages." (*Id.* ¶50.)

In February of 2015, Padilla contacted Plaintiff and told her she "could talk to them now because she would be safe," claiming Garcia had allegedly been arrested, though in truth he had not. (*Id.* ¶51.) During this conversation, Plaintiff detailed the abuse, then wrote a statement, gave OSI "various letters, money order receipts, clothing, an engraved lighter, pictures, a card, and a book with Garcia's home phone number written inside", and directed the investigators to the sex toys that Garcia had given her. (*Id.*)

Garcia was arrested in August of 2015 and pled guilty to raping Plaintiff and another inmate, for which he was sentenced to 10 years' probation. (*Id.* ¶52.) Garcia, however, was not the only corrections officer who was charged with and/or convicted of some form of sexual abuse of the inmates at Bedford. In fact, between 2009 and 2015, five Bedford corrections officers were charged with and/or convicted of rape. (*Id.* ¶55.) Further, "several prior lawsuits have been filed about the sexual abuse of inmates at Bedford." (*Id.*)

Plaintiff claims that as a result of her abuse she has suffered "serious physical, mental, and emotional injury including insomnia, depression, anxiety, emotional distress, weight loss and heightened vigilance and fear." (*Id.*) She also alleges that she contracted genital herpes, a sexually transmitted disease, from Garcia. (*Id.* ¶56.)

The Supervisory Defendants are Kaplan, Snyder, and Padilla. None of these defendants actually participated in the sexual abuse of Plaintiff. (*See generally* Compl.)

Defendant Kaplan is the Superintendent of Bedford charged with various responsibilities, including, "the supervision of staff and inmates to ensure a safe environment", "the housing

assignment of inmates within the facility", and "establishing and/or enforcing the customs and practices with regard to sexual contact . . . between employees and inmates at Bedford." (*Id.* ¶12.)

Defendant Snyder was the Deputy Superintendent of Bedford responsible for the following: "training and supervising staff and inmates to ensure a safe environment", "decisions concerning . . . [the] remov[al of] staff from contact with prisoners", "decisions concerning the assignment of inmates", and "establishing and/or enforcing the customs and practices with regard to sexual contact . . . between employees and inmates at Bedford." (*Id.* ¶13.)

Defendant Padilla was the lead corrections officer at OSI, responsible for "supervising, controlling and ensuring the safety of inmates at Bedford as well as investigating, among other things, allegations of sexual misconduct within the facility." (*Id.* ¶11.)

## DISCUSSION

### I. Standard of Review[11]

#### A. Rule 12(b)(1)

A challenge to a federal court's subject matter jurisdiction is properly raised by way of a 12(b)(1) motion. *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010); *Alliance for Envt'l Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87-88 (2d Cir. 2006). Without jurisdiction, the Court is devoid of the "power to adjudicate the merits of the case." *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 55 (2d Cir. 2016). It is well-settled that the "plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (citing *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002)).

---

[11] Plaintiff is represented by counsel and thus not entitled to the particularly liberal reading of complaints that would be afforded a *pro se* litigant. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

### B. Rule 12(b)(6)

On a 12(b)(6) motion, dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679.

The facts in the complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 555. To be sure, the critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Id.* at 570. Pursuant to that standard, a motion to dismiss will be denied where the allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### II. 42 U.S.C. § 1983 Claims

Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). A Section 1983 claim has two essential elements that must be pled and proved: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges. *See Annis v. Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).

**A. Personal Involvement**

Section 1983 supervisory liability requires proof of "personal involvement of defendants in [the] alleged constitutional deprivations." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks omitted); *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013). Prior to the Supreme Court's decision in *Iqbal*, the Second Circuit held that personal involvement could be shown by demonstrating that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). In *Iqbal*, the Supreme Court emphasized that "supervisor liability" is a misnomer and should not be confused with *respondeat superior*. *Iqbal*, 556 U.S. at 676-77. Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676. Ultimately, however, the required showing will vary and should be reflective of the constitutional question at issue. *Id.* at 676.[12]

The Second Circuit has not affirmatively decided whether *Iqbal* abrogates some or all of the *Colon* factors with respect to supervisory liability. *See Turkmen v. Hasty*, 789 F.3d 218, 250 (2d Cir. 2015) (*Colon* factors may demonstrate personal involvement, provided "th[e] standard – be it deliberate indifference, punitive intent, or discriminatory intent – reflects the elements of the underlying constitutional tort"), *reversed in part on other grounds sub. nom.*, *Ziglar v. Abbas*, 137 S. Ct. 1843 (2017); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that

---

[12] In *Iqbal*, the constitutional issue related to invidious discrimination, so the Court found that plaintiff was required to "plead and prove that the defendant acted with discriminatory purpose," *Iqbal*, 556 U.S. at 676, and thus allegations that the supervisor knew "of his subordinate's discriminatory purpose" were insufficient, *id.* at 677.

*Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations").

This Court now holds, as it did in *Matteo v. Perez*, No. 16-CV-1837, 2017 WL 4217142, at *4 (S.D.N.Y. Sept. 19, 2017), that all five of the *Colon* factors are still in play, at least as it pertains to claims that require a showing of deliberate indifference. This holding is shared by the majority of district courts in this Circuit. *See e.g. Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.'"); *see also Parris v. N.Y. State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013); *Plair v. City of New York*, 789 F. Supp. 2d 459, 465-66 (S.D.N.Y. 2011) (noting that *Iqbal* did not affect *Colon*'s applicability to deliberate indifference cases); *Qasem v. Toro*, 737 F. Supp. 2d 147, 152 (S.D.N.Y. 2010); *D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010), *aff'd*, 462 F. App'x 79 (2d Cir. 2012); *Smolen v. Fischer*, No. 12-CV-1856 (PAC)(AJP), 2012 WL 3609089, at *8 (S.D.N.Y. Aug. 23, 2012); *and see Stamile v. County of Nassau*, No. 10-CV-2632 (AKT), 2014 WL 1236885, at *4 (E.D.N.Y. Mar. 25, 2014) (applying *Colon* in absence of clear direction from Second Circuit); *Carpenter v. Apple*, No. 15-CV-1269, 2017 WL 3887908, at *9 (N.D.N.Y. Sept. 5, 2017).

The Supervisory Defendants argue that the allegations in Plaintiff's Complaint amount to nothing more than contentions that the Supervisory Defendants should be held liable simply because of their positions as supervisors. (*See* Defs. Br. at 5; Defs. Reply in Further Support of the Motion, ("Defs. Reply") (ECF No. 30), at 1.) This Court disagrees. Plaintiff has pled sufficient facts to bring the Supervisory Defendants' conduct within either the third or fifth *Colon* categories. Though this Court finds the pleadings sufficient, it notes that the factual allegations are thin.

*1. Colon Category Three*

The third *Colon* category provides for personal involvement where "the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." *Colon*, 58 F.3d at 873. Importantly, "allegations as to defendants' knowledge of alleged constitutional violations" are only sufficient if "accompanied by allegations that the defendants had direct responsibility for monitoring the [] violation or that there had been a history of previous episodes putting the defendants on notice of the problem." *Parris*, 947 F. Supp. 2d at 364 (citing *Candelaria v. Coughlin*, No. 91-CV-1117, 1991 WL 113711, at *2 (S.D.N.Y. June 11, 1991)) (internal quotations and alterations omitted); *see also Plair*, 789 F. Supp. 2d at 466 (insufficient without facts regarding prior episodes). Unlike in *Parris* or *Plair*, Plaintiff has alleged sufficient facts to demonstrate a "history of previous episodes" of sexual assault and/or rape, such that the Supervisory Defendants should have reasonably been on notice of the problem and were responsible for monitoring such conduct. (*Compare* Compl. ¶¶ 12-14, 55, 42-44, 48-50, 55 *with Parris*, 947 F. Supp. 2d at 365 (no personal involvement without allegations defining defendants' responsibilities) *and Plair*, 789 F. Supp. 2d at 466 (no personal involvement where only "two cases of violence that occurred several years prior" to Plaintiff's incident).)

On the facts here, it is plausible that Defendants Kaplan and Snyder would have been notified of the five prior instances of convictions and/or charges of 3rd degree rape of Bedford corrections officers between the 2009 and 2015, (*see* Compl. ¶55), and would have been responsible for deciding how to change Bedford's policies and procedures related to sexual conduct, (*see id.* ¶12-14.) *See Smolen*, 2012 WL 3609089, at *9 (plausible that supervisory defendants would have been notified of broken windows and would be responsible for deciding to

fix them); *see also Carpenter*, 2017 WL 3887908, at *10 (third *Colon* category met where plaintiff "alleged that [supervisory defendant] was on notice of previous incidents").

On a more granular level, it is plausible that Kaplan and Snyder had actual knowledge, (*see* Compl. ¶72), or were at least notified of, the suspicions surrounding Garcia's conduct and were responsible for monitoring same. Plaintiff's meetings with OSI were sufficient to put them on notice of the sexual abuse, as well as the fact that Plaintiff was transferred within the facility at least once (*id.* ¶48),[13] a decision squarely within their responsibilities, (*id.* ¶¶12-13.) Further, Kaplan and Snyder, at varying degrees, were also responsible for "ensur[ing] a safe environment", (*see* Compl. ¶12), "whether to remove staff from contact with prisoners" and vice versa, (*id.* ¶13), and "enforcing the customs and practices with regard to sexual contact and conduct between employees and inmates at Bedford", (*id.* ¶¶12-13); *see also Qasem*, 737 F. Supp. 2d at 152 (personal involvement pled where "complaint allege[d] that defendants were responsible for determining where inmates were to be housed and the assignment of guards" in connection with additional facts).

With respect to Defendant Padilla, the analysis is similar. It is plausible that Padilla knew Plaintiff was being sexually abused by Garcia and could have, but failed to take further action. *See Parris*, 947 F. Supp. 2d at 364 (allegations of knowledge and responsibility for monitoring conduct sufficient). Padilla was the lead investigator at OSI, charged with "controlling and ensuring the safety of inmates at Bedford," and "investigating . . . allegations of sexual misconduct." (*See* Compl. ¶11.) When she met with Plaintiff for the first time in April of 2014, Padilla "questioned [Plaintiff] about sexual contact" and was told that Plaintiff "was afraid to speak", that "CO Maldonado had intimidated her", and "she feared punishment or retaliation if she spoke." (*Id.*

---

[13] When Plaintiff was moved within the facility, Garcia was not reprimanded or monitored, and was able to continue abusing Plaintiff. (*See* Compl. ¶48.)

¶39.)[14] Such allegations indicate that Padilla suspected inappropriate conduct *before* she even spoke to Plaintiff, and those suspicions were confirmed by Plaintiff's articulated fears, warranting further action. By failing to investigate further,[15] remove Plaintiff from Garcia's reach, or monitor Garcia at all, (*see* Compl. ¶43), Padilla directly perpetuated the custom of constitutional violations.

Further, Plaintiff alleged that other officers had actual knowledge of Garcia's conduct. For example, shortly after the incident at the officer's station, (*see* Compl. ¶27), another officer "wondered aloud to Plaintiff how small a person had to be to fit under that desk", (*id.* ¶31.) At times, officers would "shine[] their flashlights on Garcia when he was in Plaintiff's cube to warn him or chase him away." (*Id.* ¶46.) Additionally, "other officers . . . [would] mak[e] warning phone calls if a supervising officer" was nearby during the abuse. (*Id.* ¶26.) In December of 2014, shortly after Garcia "kissed and touched Plaintiff in the school building basement," an officer, believed to be a sergeant, "reminded Garcia about the importance of 'appearances.'" (*Id.* ¶49.) Further, the evening that Garcia threatened to kill himself, (*id.* ¶44), a Jane Doe corrections officer "knew that something inappropriate happened" and told another officer of her concerns. (*Id.* ¶45.) Apparently, that officer informed another, but still nothing was done to monitor Garcia or attempt to limit his contact with Plaintiff. (*Id.*) As a result, "multiple staff members" were aware of Garcia's unconstitutional conduct and did nothing, indicating the existence of a "blind eye policy." *See Stamile*, 2014 WL 1236885, at *8 (facts relevant to "blind eye policy" were sufficient for personal involvement); *See Qasem*, 737 F. Supp. 2d at 154 (third *Colon* category met where "plaintiff alleges[] substantial evidence [that] [defendant's] misconduct known to a variety of individuals").

---

[14] Defendant's contention that Plaintiff refused to cooperate and "outright deni[ed] that she was being abused by Garcia, (*see* Defs. Br. at 9; Defs. Reply at 4-5), is plainly incorrect. Plaintiff made no such allegations regarding this meeting. (*See* Compl. ¶39-40.) Instead, Plaintiff explicitly told the investigators that she was afraid to speak because she had been threatened. (*Id.* ¶39-40.)

[15] This Court acknowledges that Padilla went to meet Plaintiff a second time six months later. (*See* Compl. ¶47.)

The Supervisory Defendants were responsible for, *inter alia*, ensuring Plaintiff was in a safe environment; the fact that there are ample allegations to demonstrate that they were on notice of Garcia's conduct and failed to secure Plaintiff's safety, demonstrates that they created and/or perpetuated a custom whereby Garcia (and other corrections officers) could sexually abuse the inmates at Bedford with impunity.

2. *Colon Category Five*

The fifth *Colon* category permits supervisory liability where the defendants "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873. For deliberate indifference, "plaintiff must allege that the supervisor was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed." *Stamile*, 2014 WL 1236885, at *6 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994)); *see also Poe v. Leonard*, 282 F.3d 123, 142 (2d Cir. 2002) (allegations that supervisor "knew or should have known that there was a high degree of risk," of unconstitutional conduct necessary).

Plaintiff has alleged that the Supervisory Defendants had "outright knowledge that Garcia was abusing Plaintiff" but failed to do anything about it, including failing to monitor Garcia. (*See* Compl. ¶72, 39-43, 45-46, 48.) Such allegations are sufficient to demonstrate deliberate indifference. *See Qasem*, 737 F. Supp. 2d at 152-53 (deliberate indifference where defendants, *inter alia*, "did not increase supervision of Toro despite their knowledge of allegations of Toro's assaults"); *Carpenter*, 2017 WL 3887908, at *12 (allegations of "fail[ure] to act on information indicating that male corrections officers . . . were having inappropriate sexual contact with female detainees" sufficient). Considering Garcia's brazen and open display of misconduct, the prior incidences of sexual misconduct at Bedford, Plaintiff's expression of fear during her meetings with Padilla, and the apparently common knowledge within the facility that Garcia was abusing

Plaintiff, (*see supra*, II.A.1), the Supervisory Defendants "should have known that there was a high degree of risk" that Plaintiff was being assaulted; their failure to act was reckless and demonstrates their personal involvement in the deprivation of Plaintiff's constitutional rights.

Overall, this case is quite troubling, and accepting the facts as true, Garcia's conduct was reprehensible. The fact that he was able to continue this repugnant behavior for over a year speaks to the "blind eye policy" pervading the environment at Bedford and the deficiencies in Bedford's supervision. Indeed, the egregious nature and pervasiveness of the conduct assisted in pushing Plaintiff's claims over the line from conceivable to plausible. Nevertheless, discovery may demonstrate that the Supervisory Defendants are without fault. That not being the issue presently before this Court, however, Plaintiff is entitled to proceed to discovery.

### B. Qualified Immunity

The Supervisory Defendants argue that, regardless of whether or not Plaintiff has pled cognizable claims against them, they are entitled to qualified immunity. (*See* Defs. Br. at 6-8.)

Qualified immunity exists to protect federal and state officials from suits for conduct performed in their official capacity, so long as "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Morgan v. Ward*, 14-CV-7921 (GHW), 2016 WL 427913, at *7 (S.D.N.Y. Feb. 2, 2016) (citing *Martinez v. Simonetti*, 202 F.3d 625, 633-34 (2d Cir. 2000)); *see also Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When determining whether a right was clearly established, a Court must consider "whether the right in question was defined with reasonable specificity", "whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question", and "whether under preexisting law a reasonable defendant official would have understood that his or

her acts were unlawful." *Edwards v. Arnone*, 613 F. App'x 44, 46 (2d Cir. 2015) (summary order) (quoting *Dean v. Blumenthal*, 577 F.3d 60, 68 (2d Cir. 2009) (per curiam)).

Typically, the defense of qualified immunity will "rest on an evidentiary showing of what the defendant did and why." *Lamzot v. Phillips*, No. 04-CV-6719 (LAK), 2006 WL 686578, at *8 (S.D.N.Y. Mar. 16, 2006) (citing *Curry v. City of Syracuse*, 316 F.3d 324, 334 (2d Cir. 2003)). On a 12(b)(6) motion, however, the defendant "must accept [a] more stringent standard." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). To be sure, the "facts supporting the defense must appear on the face of the complaint", *id.* (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67 (2d Cir. 1998), *and* the motion must only be granted if "it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief," *id.* (quoting *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992)) (emphasis added).

This Court cannot say that the Supervisory Defendants are shielded from qualified immunity at this time.[16] Plaintiff has pled sufficient facts for an Eighth Amendment constitutional violation against the Supervisory Defendants and precedent demonstrates that she has pled the deprivation of a well-established right. The Second Circuit has long held that "sexual abuse of a prisoner by a corrections officer may in some circumstances violate the prisoner's right to be free from cruel and unusual punishment." *Boddie v. Schnieder*, 105 F.3d 857 (2d Cir. 1997). Specifically, where the conduct "serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate," it violates the Eighth Amendment. *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015). Facts alleging Plaintiff's repeated sexual assault, harassment, and abuse by Garcia for his own sexual gratification, evince a deprivation of

---

[16] The argument for immunity seems to be that Plaintiff has failed to demonstrate that the Supervisory Defendants violated a clearly established right because "none of [them] are alleged to have sexually abused plaintiff." (*See* Defs. Reply at 4-5.) Such an argument is specious and would preclude any sexually abused plaintiff from suing supervisors whose actions perpetuate the constitutional violations, unless those supervisors too participated in the sexual assault themselves. That is not the standard of the law; the argument must fail.

her Eighth Amendment right to be free from cruel and unusual punishment. *See Boddie*, 105 F.3d at 861 ("[T]here can be no doubt that severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to constitute an Eight Amendment violation."); *accord Qasem*, 737 F. Supp. 2d at 153; *Carpenter*, 2017 WL 3887908, at *12.

Further, where, as here, the allegations strongly suggest that the defendants are aware of unconstitutional conduct and "fail[] to reasonably investigate or address" such allegations, they are not entitled to qualified immunity. *Jermott v. Coughlin*, 85 F.3d 61, 67 (2d Cir. 1996) (affirming denial of qualified immunity to defendants); *see also McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004) (no qualified immunity where complaint alleged various failures). The Supervisory Defendants appear to argue that their conduct was objectively reasonable given that "the conduct alleged in the complaint was lawful", "there are no factual allegations tying [Kaplan and Snyder] to the alleged sexual abuse in any way," and as to Padilla, that she is the "hero" of this story. (Defs. Reply 5.)

In light of the extent and nature of the alleged sexual abuse spanning 13 months, "the numerous warning signs alleged", *see Qasem*, 737 F. Supp. 2d at 153-54, the history of sexual abuse at Bedford, the failures alleged in the Complaint (including Padilla's failure to take further steps to investigate, despite Plaintiff's clear indication that she was afraid to talk for fear of her safety, (*see* Compl. ¶39-40) and the failure to monitor Garcia or limit his contact with Plaintiff, despite ample evidence that he was engaging in inappropriate sexual contact with her), and "the questionable . . . decisions made with respect to plaintiff during the" OSI investigation, *see Qasem*, 737 F. Supp. 2d at 153-54, this Court hereby denies the Supervisory Defendants' motion for qualified immunity without prejudice, *see Carpenter*, 2017 WL 3887908. at *12.

### III. State Law Claims

Finally, Defendants argue, and Plaintiff acknowledges, that the fourth, fifth, and six causes of action are ripe for dismissal for lack of subject matter jurisdiction. (*See* Defs. Br. at 9; Plf. Br. at 9.) Any state law claims against them which "arise from acts or omissions within the scope of their employment at DOCCS" are dismissible for lack of subject matter jurisdiction. *See Parris*, 947 F. Supp. 2d at 365; *Baker v. Coughlin*, 77 F.3d 12, 15-16 (2d Cir. 1996); *see also* N.Y. Corr. Law § 24 (requiring that lawsuits related to DOCCS employees' conduct within the scope of their employment, be brought in New York Court of Claims against the State). The Supervisory Defendants' motion in this respect is granted and the state law claims are dismissed as against Defendants Kaplan, Snyder, and Padilla, with prejudice.

### CONCLUSION

For the foregoing reasons, the Supervisory Defendants' motion to dismiss Plaintiff's Complaint is hereby DENIED in part and GRANTED in part. The motion is granted to the extent the Supervisory Defendants have moved to dismiss Plaintiff's state law claims against them arising from conduct that occurred within the scope of their employment; such claims are hereby dismissed *with prejudice*. The motion is denied on all other grounds. The Supervisory Defendants are directed to file an answer on or before April 24, 2018. All parties are directed to appear for an Initial Pre-trial Conference on April 27, 2018 at 12:10 p.m. and prepare and provide a case management plan to chambers in advance thereof. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 28.

Dated: March 22, 2018  
White Plains, New York

SO ORDERED:

NELSON S. ROMÁN  
United States District Judge